Jane WOLD, Plaintiff,

v.

HUNT OIL COMPANY, a Delaware corporation, Defendant.

No. 98–CV–196–J.

United States District Court,
D. Wyoming.

June 11, 1999.

JN Murdock, Nick Murdock & Associates, Casper, WY, for Jane Wold, plaintiff.

Charles L Kaiser, Charles A Breer, Davis Graham & Stubbs, Denver, CO, for Hunt Oil Company, a Delaware corporation, defendant.

## ORDER AND OPINION ON CROSS MOTIONS FOR SUMMARY JUDGMENT

ALAN B. JOHNSON, Chief Judge.

The parties' cross motions for summary judgment came before the Court for hearing and consideration. The Court, having considered the parties' motions and responses one to the other, the arguments of counsel at the hearing, the pleadings of record, the applicable law, and being fully advised in the premises, and in accordance with the Court's oral rulings from the bench at the hearing as enumerated more fully on the record of those proceedings, FINDS and ORDERS as follows:

### Background

This is a case that was removed to federal court from state court. The parties have entered into a stipulation that resolves their outstanding dispute regarding the amount in controversy requirement. The pending motion to remand to state court for lack of subject matter jurisdiction is now MOOT.

Now at issue are the parties' cross motions for summary judgment. The legal issue the parties have agreed to submit to the Court is whether charges termed "gathering charges" by both Hunt Oil Company and the owner of the gathering lines are legally deductible under the provisions of Wyo.Stat. §§ 30–5–301 et seq. Plaintiff contends that her overriding royalty interest, an interest carved out of the leasehold, is one that is "free of the costs of production" and that pursuant to the applicable statute, "costs of production" include charges for gathering. She advocates that the Wyoming Royalty Payment Act expressly provides that costs for gathering cannot be deducted from her interest and that costs incurred that are necessary to get the gas to the market pipeline are not post-production costs that can be deducted from her overriding royalty interest. She asserts that costs of production are not deductible until after the product enters the regulated, open-access market pipeline.

The defendant contends that the gathering charges at issue here are post-production costs chargeable to the interest of the royalty owner, such as plaintiff. Defendant urges this Court to construe the Wyoming Royalty Payment Act *in pari materia* with the Wyoming taxation statutes relating to oil and gas and mineral production. As a result, the defendant contends that the cost of transporting gas downstream from the outlet of the dehydrator must be shared by all interest owners because those are "post-production transportation" costs and not costs of production. The defendant asserts Wyoming has adopted the marketable condition rule, which requires that the lessee bear all costs to put gas into marketable condition and that lessee and royalty owners share proportionately subsequent downstream costs. Defendant asserts no jurisdiction and no law requires that a lessee alone bear reasonable costs incurred after gas is put into marketable condition. In making this argument and advocating construction of the tax and royalty payment statutes in tandem, the defendant argues that the point of demarcation must be that where gas is in marketable condition—which in

this case is at the outlet of the dehydrator. Costs incurred after that point are post-production costs that should be shared.

Defendant argues that the Royalty Payment Act and the oil and gas production tax statutes have the same purpose—i.e., determining when the production process for gas is complete—and use many of the same terms, thus, making it appropriate to resort to the tax statutes to construe the royalty payment statute.

### Standard of Review Fed.R.Civ.P. 56

Summary judgment is appropriate if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *Allen v. Muskogee, Oklahoma,* 119 F.3d 837, 839–840 (10th Cir. 1997). A disputed fact is material if it might affect the outcome of the suit under governing law, and the dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. The factual record and reasonable inferences therefrom are construed in the light most favorable to the nonmovant. *Id.,* quoting *Anderson v. Liberty Lobby, Ind.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) and *Gullickson v. Southwest Airlines Pilots' Assoc.,* 87 F.3d 1176, 1183 (10th Cir.1996). The moving party need not affirmatively negate the nonmovant's claim in order to obtain summary judgment, but instead bears the initial burden of showing—that is, point out to the district court—that there is an absence of evidence to support the nonmoving party's case. *Id.,* quoting from *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265.

### Discussion

The Royalty Payment Act provides the following definitions:

**§ 30–5–304. Definitions.**

(a) As used in this act:

(i) "Lessee" means the person entitled under an oil and gas lease to drill operate wells, paying the lessor a royalty and retaining the remainder, known as the working interest. The lessee pays all costs of production out of his interest, the lessor's interest being free and clear of all those costs;

(ii) "Lessor" means the mineral owner who has executed a lease and who is entitled to the payment of a royalty on production, free and clear of the costs of production;

(iii) "Operator" means a person engaged in the business of drilling and producing wells for oil and gas;

(iv) "Other nonworking interest" means any interest in an oil and gas lease or well which is not a royalty, overriding royalty or working interest;

(v) "Overriding royalty" means a share of production, **free of the costs of production,** carved out of the lessee's interest under an oil and gas lease;

(vi) "Costs of production" means all costs incurred for exploration, development, primary or enhanced recovery and abandonment operations including, but not limited to ease acquisition, drilling and completion, pumping or lifting, recycling, **gathering,** compressing, pressurizing, heater treating, dehydrating, separating, storing or **transporting** the oil to the storage tanks or **the gas into the market pipeline.** "Costs of production" does not include the reasonable and actual direct costs associated with transporting the oil from the storage tanks to market or the gas from the point of entry into the market pipeline or the processing of gas in a processing plant;

(vii) "Royalty" means the mineral owner's share of production, free of the costs of production;

(viii) "Working interest" means the interest granted under an oil and gas lease, giving the lessee the right to work on the leased property to search for, develop and produce oil and gas and the obligation to pay all costs of production;

(ix) "This act" means W.S. 30–5–301 through 30–5–305.

(Emphasis supplied).

Defendant has relied heavily on the Colorado case, *Garman v. Conoco, Inc.,* 886

P.2d 652 (Colo.1994). The case merits discussion. The Colorado Supreme Court held in *Garman,* applying Colorado law, the owner of an overriding royalty interest in gas production was required to bear a proportionate share of post-production costs. In *Garman,* Conoco held certain leases subject to the Garmans' overriding royalty interests. The leases were located in a unit and were in full force and effect by the production of gas. Conoco operated both the unit and the processing plant, which was located outside of both the lease and unit boundaries. From the wellhead, gas entered a gathering line for transportation to the plant. At the plant, gas from the unit was processed into (1) residue gas; (2) propane; and (3) a combined stream of butane and natural gasoline. Gross proceeds from the sale of the individual products were greater than the revenues that would have been obtained from the sale of raw, unprocessed gas at the wellhead. Garmans argued that post-production costs incurred to convert the raw gas into a marketable product should not be charged against the nonworking interest owners. They conceded, however, that costs incurred after the gas is made marketable, which actually enhance the value of the gas, were to be borne proportionately by all parties benefitted by those operations.

Conoco argued that all post-production costs incurred after the gas is severed from the ground and reduced to possession should be borne proportionately by royalty, overriding royalty and working interest owners. It argued severance occurs at the wellhead and all expenses after severance improve or enhance the value of the gas from its natural, unprocessed state.

The Colorado Court noted that both royalty and overriding royalty interests are non-risk and non-cost bearing interests. Responding to Conoco's objection that Garmans were getting a free ride on certain costs incurred after gas is brought to the surface, the Colorado court stated "that the relationship between the parties specifically provides for a 'free-ride' on

costs incurred to establish marketable production." *Garman,* 886 P.2d at 657.

That court then noted no consensus exists regarding the allocation of expenses incurred after discovery of gas. Two lines of thought have developed. The Texas and Louisiana Courts have "adopted the rule that nonoperating interests must bear their proportionate share of costs incurred after gas is severed at the wellhead." *Garman,* 886 at 657–58. Kansas and Oklahoma have adopted a contrary rule based on an operator's implied duty to market gas produced under an oil and gas lease. "The implied duty to market means a duty to get the product to the place of sale in a marketable form." It noted then that "Wyoming has codified the marketability approach." *Id.* at 658. It held:

> Our answer is limited to those post-production costs required to transform raw gas into a marketable product ... As we explained at the outset, many different types of expenses may be involved in the conversion process. Upon obtaining a marketable product, any additional costs incurred to enhance the value of the marketable gas, such as those costs conceded by the Garmans, may be charged against the nonworking interest owners ... To the extent that certain processing costs enhance the value of an already marketable product, the burden should be placed upon the lessee to show such costs are reasonable, and that actual royalty revenues increase in proportion with the costs assessed against the nonworking interests.

*Id.* at 660–661 (footnotes omitted). Further, in a footnote, it stated "Marketable means 'fit to be offered for sale in a market; being such as may be justly and lawfully bought or sold ... wanted by purchasers'." *Id.,* 886 P.2d at 660, n. 26. It also cited with approval a treatise which stated "there is a distinction between acts which constitute production and acts which constitute processing or refining ... [a]fter a marketable product has been obtained, then further costs in improving or

transporting such product should be shared by the lessor and lessee." *Id.*, 886 P.2d at 661, n. 27, citing 3 Kuntz § 40.5. "Absent an assignment provision to the contrary, overriding royalty interest owners are not obligated to bear any share of post-production expenses, such as compressing, transporting and processing, undertaken to transform raw gas produced at the surface into a marketable product." *Id.* at 661.

The argument advanced by the defendant here is that the gas is marketable when it comes out of the outlet of the dehydrator and therefore, the marketable condition rule should apply at that point. The defendant contends further that the Wyoming court looks to other statutes with the same object and purpose when construing the meaning of language in dispute. Here, defendant argues, resort to the tax statutes is appropriate because there is a close connection between royalties and taxes and reliance on the requirements of one to construe the other is appropriate.

Defendant contends that under the Wyoming production tax statute, the costs at issue in this case are regarded as "post-production transportation costs." The tax statute values gas for tax purposes on the "fair cash market value of the product after the ... production process is completed." Wyo.Stat. § 39–2–208(a). Wyo. Stat. § 39–2–308(b) further provides:

(b) The ... production process is completed:

...

(ii) For natural gas, after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first.

The tax statutes define "gathering" as "the transportation of crude oil or natural gas from multiple wells by separate and individual pipelines to a central point of accumulation, dehydration, compression, separation, heating and treating or storage." Wyo.Stat. § 39–2–208(m)(iii). The defendant argues the tax statute is consistent with and confirms that a lessee is obligated only to put gas into marketable condition and that after that point, costs are to be shared by all interest owners.

The plaintiff, on the other hand, argues that the Royalty Payment Act ("RPA") should not be construed *in pari materia* with the tax statutes and that it is a remedial, stand-alone, unambiguous statute. Plaintiff argues that the RPA specifically defines costs of production and expressly includes gathering costs. The documents filed in support of the plaintiff's motion clearly demonstrate that the parties, including plaintiff and Hunt, regarded the charges at issue here as *gathering* charges. After plaintiff's attorney brought to Hunt's attention the fact that gathering charges had been improperly withheld from the plaintiff's royalty payments, it refunded the gathering charges in question to her. A further letter from plaintiff's attorney noted that the refund was not complete and requested further refunds. About a month later, Hunt changed its mind, and stated:

Since making the refund payment to Ms. Wold, we have had the opportunity to completely research this matter. We have met with our production, marketing and accounting groups and have determined that charges are actually charges for "transportation."

Exhibit 1 to plaintiff's memo.

The properties at issue in this case consist of plaintiff's interest in the Boone Dome and Nitchie Gulch units in Natrona and Sublette Counties, Wyoming. Gas from the Nitchie Gulch Unit is gathered and then injected into a pipeline owned by Questar that then takes gas to market. Gas from the Boone Dome unit is gathered in a third-party gathering system and is then injected into a pipeline operated by

Kansas Nebraska Energy ("KN") that brings the gas to market. The Questar and KN pipelines are FERC-regulated lines and tariffs are charged for the use of those pipelines. Plaintiff contends within the industry, these pipelines are referred to as market pipelines, which are open to all buyers of gas through KN and Questar and are subject to FERC review. Hunt's point of entry into the market pipeline is set by agreement.

To get the gas from the well to the entry points on the market pipeline, gas must be gathered and brought to the proper pressure necessary for injection into the market pipeline—which is the gathering system. The Nitchie Gulch gathering system is owned by Questar and is not regulated by FERC. If a buyer other than Questar purchases from the Nitchie Gulch production, the buyer must pay the amount required by Questar for gathering or negotiate a contract with Questar for use of the gathering system.

KN's gathering system at Boone Dome involves various gathering agreements with third parties for gathering Boone Dome gas and injecting into the KN market pipeline. For both Nitchie Gulch and Boone Dome, various contracts for gathering and compression have been executed.

Plaintiff argues that the Royalty Payment Act does not allow gathering deductions. Plaintiff asserts that the common meaning of market pipeline is consistent with the legislative goal to be achieved— i.e., an easily discernible physical point at which costs could burden the royalty owner's interest. She argues the provisions of the RPA were not displaced by the severance tax provisions enacted one year later which were designed to treat oil and gas equally with other minerals for taxation purposes. Plaintiff argues that production costs occurring prior to entry into the regulated, market pipeline is by terms of the statute a "cost of production" and not deductible from royalty. Plaintiff contends the RPA is not ambiguous and that resort to statutory construction is not required. If, however, the Court were to

disagree with such contention, plaintiff argues that even statutory construction would not permit the deductions that have been claimed by Hunt.

■ The RPA was designed to protect royalty owners. and permit them to determine if correct payment of royalties has been made. Producers were required to report/disclose permissible deductions and reporting penalties are imposed under the act if disclosures are not given. The Wyoming RPA is a remedial statute and the Wyoming Supreme Court construes its provisions liberally to achieve the Act's remedial purpose. See *Independent Producers Mktg. Corp. v. Cobb*, 721 P.2d 1106, 1110 (Wyo.1986); *Moncrief v. Harvey*, 816 P.2d 97 (Wyo.1991); *Town of Moorcroft v. Enron Oil Trading & Transportation Co.*, 986 F.2d 1429 (Table) (Unpublished disposition), text at 1993 WL 34700 (10th Cir. 1993) (Wyo.law).

Our primary purpose in construing a statute is to determine the intent of the legislature. legislative intent should be ascertained, as nearly as possible, from the language of the statute viewed in the light of its object and purpose. . . .

The Royalty Payment Act is a remedial statute. Such statutes are to be liberally construed to achieve their remedial purpose. . . . In Independent producers Marketing Corp. v. Cobb, we expressed the remedial purpose of this Act as follows:

"The district court's application of the Royalty Payment Act in this case is consistent with the legislature's obvious intent to stop oil producers from retaining other people's money for their own use."

Although there is no legislative history available for this statute, the language of the statute itself clearly demonstrates its remedial intent.

*Moncrief v. Harvey*, 816 P.2d at 105 (citations omitted).

■ Given this background of clear legislative intent and the rule that remedial

statutes should be liberally construed, one must contrast this against the traditional construction of statutes imposing taxes. In construing tax statutes, the court does not attempt to accomplish a legislative intent. Instead, the court is precluded from imposing a tax unless the statute is clear and unambiguous on its face. *Chevron U.S.A., Inc. v. State,* 918 P.2d 980, 984–86 (Wyo.1996).

■ The organization and subject matter of the RPA reflects a clear legislative purpose of simplifying the computation of royalties and providing a mechanism by which the royalty owner is able to determine if royalties are paid correctly. The statutory definition of "costs of production" excludes all charges between the wellhead and the market pipeline except those specifically excluded from the definition. The very charges at issue in this case are included in the definition of charges that are not deductible: gathering, dehydration, compression and transportation to the market pipeline. Plaintiff has offered in support of her position the affidavit of Don Stinson, who opines that the usual industry meaning and use of "costs of production" includes gathering charges and that the market pipeline is the point of delineation for deductibility. After gas enters the market pipeline, deductions are permissible, but the royalty owner's interests are protected by regulatory oversight of FERC. If engrafting tax provisions onto royalty provisions is permitted, uncertainty and opportunity for manipulation by those in Hunt's position is continued and encourages further abuses that the RPA is designed to eliminate. The language of the RPA is unambiguous, and the Court finds that statutory construction, specifically construing the RPA *in pari materia* with the tax statutes as has been proposed by defendant, is unnecessary and impermissible.

The Court notes that there are no Wyoming cases that specifically address this particular section of the RPA. However, gathering charges are specifically included as nondeductible costs of production in

express, unambiguous language in the RPA. Wyo.Stat. § 30–5–304. The Court finds it must apply the express language of statute and is not required to resort to statutory construction. The purposes of the applicable taxation statutes are clearly distinguishable from those of the RPA and are not necessarily harmonious with or designed to accomplish purposes similar to those of the RPA.

The Court is not convinced that the assessment of the Colorado Supreme Court, in *Garman v. Conoco,* is correct when it stated that "Wyoming has codified the marketability approach." The Wyoming statutory scheme, as embodied in the RPA, is unique. It is not particularly helpful to engraft upon that express statutory scheme the common law construction approach that is reflected in the Colorado court's *Garman* opinion. The Wyoming statutes must be read alone and without reference to the common law as it may have evolved in other states such as Colorado.

In this case, it is clear that until the instant dispute arose, Hunt Oil Company and the owner of the gathering lines in use regarded the charges at issue as gathering charges. Hunt has argued, without merit, that its change of terminology, calling what it unquestionably once regarded as gathering charges now transportation charges, works to move these charges out of statute's "costs of production" definition. Such an approach is a transparent attempt to convert non-deductible costs of production into a post-production costs and to pass those non-deductible costs of production onto non-risk and non-cost bearing interests, such as those of plaintiff. The RPA clearly precludes this and the Court will give effect to the express language of the statute as written. In reaching this conclusion, the Court does not need to express any opinion with respect to plaintiff's argument that the point of demarcation is entry of the gas into a FERC-regulated pipeline. The facts of this case support the conclusion that the gas at is-

sue here, while it may indeed have been "marketable" at the outlet of the dehydrator as defendant has suggested, was placed into gathering lines for subsequent transportation into Questar's or KN's market pipelines. The gathering costs are not costs of production chargeable against the interest of overriding royalty interest owner.

Accordingly, and for the foregoing reasons, in accordance with the Court's oral rulings from the bench at the hearing, as enumerated more fully of the record of the hearing, it is therefore

ORDERED that plaintiff's motion for summary judgment shall be, and is, GRANTED. It is further

ORDERED that defendant's motion for partial summary judgment shall be, and is, DENIED.

### PARTIAL JUDGMENT

The Court having entered its Order and Opinion on Cross Motions for Summary Judgment in favor of Plaintiff Jane Wold, in which the Court determined that the Wyoming Royalty Payment Act prohibits the gathering deductions claimed by defendant Hunt, and the parties' having stipulated to entry of judgment in favor of plaintiff in the event she prevailed on the motion, by separate stipulation filed March 24, 1999, it is therefore

ORDERED, ADJUDGED AND DECREED that plaintiff recover of defendant Hunt Oil Company the sum of $34,842.47, for claims for royalties due under Wyo. Stat. §§ 30–5–303 and 30–5–304, and statutory interest on such amounts claimed under § 30–5–303, 18% per annum, except those "amounts alleged by plaintiffs to be due under "flat rate" contracts" as identified in Paragraph 2 of the parties' Joint Motion for Scheduling Order fled March 22, 1999.