2005 WY 79

**WYOMING DEPARTMENT OF REVENUE, Appellant (Respondent),**

v.

**Michael T. GUTHRIE, d/b/a MTG Operating Company, Appellee (Petitioner).**

No. 04–178.

Supreme Court of Wyoming.

July 14, 2005.

Representing Appellant: Patrick J. Crank, Wyoming Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General. Argument by Mr. Hardsocg.

Representing Appellee: Randall T. Cox, Gillette, Wyoming.

Before HILL, C.J., and GOLDEN, KITE, VOIGT, and BURKE, JJ.

GOLDEN, Justice.

[¶ 1] The Department of Revenue (the Department) disallowed a deduction taken by Michael T. Guthrie, d/b/a MTG Operating Company (MTG) for the price of its coal bed methane production used by the purchaser of the gas production to fuel related compression activities. Although it is undisputed that MTG did not get paid for the gas the purchaser reported was used for fuel, the Department disallowed the fuel use deduction stating that upon audit MTG failed to verify, in a manner acceptable to the Department, the volume of gas used for fuel. MTG appealed to the State Board of Equalization (the Board), which affirmed the decision of the Department. MTG then appealed to the district court, which reversed the decision of the Board and ordered the Department to

allow the fuel use deduction as presented by MTG. The Department hereby appeals the order of the district court. After a full review of the facts and the record, this Court determines that MTG failed to produce sufficient evidence to support the fuel use deduction it claimed. The decision of the district court is reversed.

## ISSUES

[¶ 2] The Department presents the following issues for our review:

1. Was the State Board of Equalization's Decision and Order, affirming the Department of Revenue's audit assessment, supported by substantial evidence?

2. Did the District Court, in reviewing the evidentiary findings of the State Board, improperly substitute a different burden of proof for the burden of proof applied by the State Board of Equalization?

3. Did the District Court improperly substitute its review and evaluation of the evidence for the State Board of Equalization's evaluation of the evidence and evidentiary findings?

4. Did the District Court err in concluding that MTG Operating was not required to verify its taxable value as determined by the State Board of Equalization?

5. Did the District Court err in concluding that the State Board of Equalization abused its discretion and exceeded its statutory authority?

MTG presents these issues:

Did the District Court correctly conclude that the Board of Equalization ignored the great weight of the evidence and acted arbitrarily and capriciously in its decision?

Did the Board of Equalization and the Department of Revenue commit legal errors by disregarding the statutes which govern valuation of gas sold through arm's-length contracts?

Did the Board of Equalization and the Department of Revenue improperly substitute their opinions of value for the statutory definition of taxable value of gas?

Did the Board of Equalization's decision, set aside by the District Court, unlawfully impair contracts entered into by the taxpayer with its investors and purchaser?

## FACTS

[¶ 3] MTG produced coal bed methane in Wyoming. MTG sold the gas production at issue to Western Gas Resources (Purchaser) pursuant to a bona fide arm's-length transaction. The terms of this transaction were reduced to writing in three gas purchase contracts. Purchaser created the monthly gas purchase statements (invoices) and paid MTG for the volume of gas delivered, minus certain deductions taken by Purchaser. MTG accepted the price on the invoices as full payment for its production. MTG reported and paid ad valorem and severance taxes upon the full amount of revenues it received from Purchaser.

[¶ 4] The Department of Audit conducted an audit of MTG's 1997 through 1999 production. The auditor discovered that subsumed in MTG's reported taxable value of gas production was a "fuel use adjustment." Essentially, the fuel use adjustment, provided for under the terms of the gas purchase contracts, dictated that MTG would not receive payment for the quantity of its gas production delivered to Purchaser that Purchaser used for compression activities. It is undisputed that Purchaser did reduce its payment to MTG by an amount allegedly relating to gas used for fuel.

[¶ 5] The auditor requested information on how the fuel use adjustment was calculated. MTG responded that it did not know how the fuel use adjustment was calculated and referred the auditor to Purchaser for further information. The auditor did not contact Purchaser but rather again requested the information from MTG. The MTG contact responded to this further request by stating: "I do not have any information about fuel [use] deductions and I do not do any calculations for such." The auditor looked to the gas purchase contracts and the invoices for guidance, but concluded they did not contain adequate information by which the auditor could verify the fuel use adjustment. The auditor attempted to gather information from MTG by which the fuel use adjustment could

be verified several more times. MTG never responded to the satisfaction of the auditor. Ultimately, the auditor disallowed the deduction, citing MTG's failure to produce verification for it.

[¶ 6] MTG appealed to the Board. At the hearing, MTG offered testimony that the volume of fuel used for compression could be determined by applying a back calculation using the difference between the contract price and the monthly gas purchase statement prices. MTG also presented some evidence that the actual fuel use allowance taken by Purchaser was within local industry standards.

[¶ 7] The Board refused to accept the back calculation offered by MTG as verification of the fuel use adjustment. The Board found that the gas purchase contracts required volumetric information for determining the purchase price of the gas production. The Board also found that MTG failed to produce evidence of the actual amount of gas used as fuel. Because of the lack of volumetric information verifying the actual amount of fuel used for compression, the Board affirmed the Department's decision to disallow the fuel use deduction claimed by MTG.

[¶ 8] MTG appealed the Board's decision to the district court. The district court found that the evidence presented by MTG at the hearing was sufficient to adequately verify the fuel use adjustment. The district court therefore reversed the Board's decision and ordered that the deduction for fuel use be allowed. The Department of Revenue brings this appeal, claiming the Board decision was correct and the district court improperly substituted its judgment for that of the Board.

## DISCUSSION

### Standard of Review

[¶ 9] Before this Court for review is a district court order reversing the action of an administrative agency. When reviewing an agency action, the scope of district court review is limited to those matters specified in Wyo. Stat. Ann. § 16–3–114(c)(ii) (LexisNexis 2005), which provides in pertinent part:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

* * * *

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

W.R.A.P. 12.09. It was incumbent upon MTG to present sufficient argument to the district court that the Board's decision should be reversed. *Taylor v. Wyoming Bd. of Medicine*, 930 P.2d 973, 974 (Wyo.1997) ("Consistently, it has been stated that the party contesting the administrative agency decision has the burden of proving that the agency's decision was reached in violation of one or more of the standards set forth in Wyo. Stat. § 16–3–114(c).").

[¶ 10] The basic rules for this Court's review of a district court decision reviewing an agency action have been well-summarized by the Supreme Court of Kansas:

This court, on appeal from the district court in such cases, is reviewing the propriety of the decision of an inferior appellate tribunal. The legislature has not de-

fined the limits or responsibility of this court on appeal. However, its responsibility is apparent. It must review the record for the purpose of determining whether the district court observed the requirements and restrictions placed upon it by statute. (*Thompson v. Commerce Comm.*, 1 Ill.2d 350, 115 N.E.2d 622.)

The statute providing for proceedings on appeal from an order of the Commission is a directive to the district court as to the nature and extent of its review, and on appeal to the Supreme Court it must determine whether the district court has properly determined the matters to which its powers and duties extend. (*Birmingham Electric Co. v. Alabama Pub. Serv. Comm.*, 254 Ala. 140, 47 So.2d 455.)

If the findings of the district court are challenged on the basis that it did not give proper consideration to the presumption in favor of the Commission's findings, or if the district court substitutes its judgment for that of the Commission where the matter is in the realm of fair debate, this court must review the facts for the purpose of determining the issues so presented.

However, this court should not attempt to consider the appeal *de novo* and search the record for the purpose of determining the reasonableness of the Commission's order on the issues not challenged.

*Southwestern Bell Tel. Co. v. State Corp. Comm'n*, 192 Kan. 39, 386 P.2d 515, 526 (1963).

[¶ 11] This Court has acknowledged, for the purpose of determining whether the district court observed the requirements and restrictions placed upon it, the first duty of this Court is to make the same review of the agency's action as does the district court. In order to fulfill this duty, we review the case as if the appeal from agency action came directly to this Court:

On appeal from a district court's consideration of an agency action, this Court is not bound by the conclusions of the reviewing court. Rather, using the same evidentiary materials and the same review standards as the district court, we conduct an independent inquiry into the matter, just

as if it had proceeded directly to us from the agency.

*Southwest Wyoming Rehab. Ctr. v. Employment Sec. Comm'n of Wyoming*, 781 P.2d 918, 920 (Wyo.1989).

[¶ 12] This brings us to our general standard and scope of review:

For the purpose of reviewing the propriety of the district court's action, we will review the agency action as though the appeal were directly to this Court from the agency. We are governed by the same rules of review as was the district court. *Federal Trade Commission v. Sun Oil Company*, 371 U.S. 505, 83 S.Ct. 358, 9 L.Ed.2d 466 (1963); *Kansas State Board of Healing Arts v. Foote*, 200 Kan. 447, 436 P.2d 828 (1968); *Alabama Public Service Commission v. Nunis*, 252 Ala. 30, 39 So.2d 409 (1949); *Diamond Ring Ranch, Inc. v. Morton*, 10th Cir.1976, 531 F.2d 1397.

Therefore, we will not substitute our judgment for that of the agency. *Shenefield v. Sheridan County School District No. 1*, Wyo., 544 P.2d 870 (1976); *Sweetwater County Planning Committee for Organization of School Districts v. Hinkle*, Wyo., 493 P.2d 1050 (1972). [The party as to whom the Board's action was adverse] has the burden of establishing the insufficiency of the evidence to sustain the Board's decision. *Board of Trustees, Laramie County School District No. 1 v. Spiegel*, Wyo., 549 P.2d 1161 (1976).

*Board of Trustees of Sch. Dist. No. 4, Big Horn Cty. v. Colwell*, 611 P.2d 427, 428 (Wyo. 1980).

[¶ 13] In conducting our independent inquiry of the agency action, we give deference to the agency's findings of fact and review the agency's findings of law de novo:

This Court will defer to an agency's findings of fact if they are supported by substantial evidence. *Whiteman v. Workers' Safety and Comp. Div.*, 984 P.2d 1079, 1081 (Wyo.1999). Substantial evidence is "relevant evidence that a reasonable mind can accept as adequate to support an agency's conclusion." *Id.* (quoting *Casper Oil Co. v. Evenson*, 888 P.2d 221, 224 (Wyo.

1995)). We will affirm an agency's conclusions of law only if they are in accordance with the law. *Snyder v. State ex rel. Workers' Comp. Div.*, 957 P.2d 289, 293 (Wyo.1998). When an agency's determinations involve elements of law and fact, or ultimate facts, we do not give them the same deference we reserve for findings of basic fact. *Basin Electric Power Coop., Inc. v. Dep't of Revenue*, 970 P.2d 841, 850 (Wyo.1998). Instead, we separate the factual elements from the legal elements to determine whether the appropriate rule of law has been correctly applied to the facts and defer to the agency's ultimate factual finding only if there is no error in either stating or applying the law. *Id.* at 850–51.

*Amoco Prod. Co. v. State of Wyoming, Dep't of Revenue*, 2004 WY 89, ¶ 6, 94 P.3d 430, ¶ 6 (Wyo.2004).

### Analysis

[¶ 14] Preliminarily, it should be noted that the taxable value of state assessed property in Wyoming is self-reported. Wyo. Stat. Ann. § 39–13–107 (LexisNexis 2005) (ad valorem taxation); Wyo. Stat. Ann. § 39–14–207 (LexisNexis 2005) (severance taxation of mine products); *Moncrief v. Wyoming State Bd. of Equalization*, 856 P.2d 440, 445 (Wyo. 1993) ("Since the severance tax was enacted in 1969, it has been a self-assessment system."). The Department of Audit is authorized to conduct audits of the taxpayer-reported taxable value of production. Wyo. Stat. Ann. § 9–2–2003(e) (LexisNexis 2005). The Department of Revenue is authorized to request the Department of Audit to conduct an audit, involving the examination of "the books and records of any person paying ad valorem taxes," for the purpose of verifying a taxpayer's reported values. Wyo. Stat. Ann. § 39–14–208(b)(i) (LexisNexis 2005). Wyoming Statute § 39–14–208(b)(vii) (LexisNexis 2003)(amended 2005) mandates that taxpayers retain "accurate books and records of all production subject to severance taxes imposed by this article and determinations of taxable value as prescribed by [Wyo. Stat. Ann. § ] 39–14–203(b) for a period of seven (7) years and make them available to department examiners for audit purposes." Thus the taxpayer is required to maintain accurate records supporting its reported taxable value to produce to the Department, through the Department of Audit, upon audit.

[¶ 15] The respective orders of the Board and the district court sum up the divergent approaches those reviewing bodies took in reviewing the adequacy of MTG's attempt to verify its self-reported taxable value of its gas production at issue. The decision of the Board is precisely stated in its order denying the motion for reconsideration filed by MTG (all emphasis in original):

> Our ultimate finding in this case was that [MTG] failed to present the volumetric information necessary to calculate the claimed fuel use adjustments pursuant to the formulas contained in its contracts with [Purchaser].

> We found [MTG] responded to the Department of Audit's requests for information concerning the fuel use by providing information indicating that the fuel use was the difference between the price reflected on [Purchaser's] sales statements and the price calculated pursuant to the terms of the contract. . . .

> We found [MTG] did not provide volumetric information needed to **verify** the volume of [MTG's] gas used for fuel. . . . We understand a fuel use figure can be back calculated using the difference between the contract price and the gas statement price. However, the question is whether that information and the back calculation is [sic] sufficient to **verify** the claimed fuel usage. We found it was not. The volumetric information required by the contracts to calculate the fuel usage was necessary to verify the correctness of the claimed fuel usage. The volumetric information was not provided to the auditor or to us at the hearing. . . .

> * * * *

> . . . Without the volumetric information specified by the contracts under which [MTG] sold its gas, it is not possible to verify that the price reported is correct. Therefore, we found the Department was justified in denying the claimed price adjustment.

The Board found the real issue to be that MTG was requesting that the Board accept its back calculation supported by generic data on typical industry fuel usage in the region without verification of the actual volume of gas used. The Board declined to accept MTG's proposed method of calculation "as a substitute for the information required by the contract so the actual fuel use may be verified."

[¶ 16] The district court reversed the decision of the Board. The district court found:

[MTG] presented sufficient evidence at the [Board] hearing to satisfy its burden of proof regarding the fuel use deduction, and, in particular, that the amounts paid by Western Gas Resources for gas purchased from [MTG] were properly paid pursuant to arms-length [sic] contracts, including fuel use deduction clauses. [MTG] properly reported these arms-length [sic] sales and paid severance and ad valorem tax upon all amounts received from Western Gas.

The district court concluded that the Board improperly ignored the evidence presented by MTG. The district court remanded the case for calculation of "the tax due on sales of gas by [MTG] based upon the amount actually received from the sales, allowing the fuel use deductions as invoiced."

[¶ 17] As can be seen from the orders, the primary issue in this appeal is what, exactly, MTG was required to prove. Simply put, MTG argues that the taxable value of its production is the actual payment amount it received from Purchaser. MTG's argument continues that its acceptance of the invoice pricing as the appropriate price under the gas purchase contracts should be sufficient. If more is needed, then the back calculation, supported by industry standards, provides sufficient verification of the fuel use adjustment. If MTG is correct in its assertion that the invoices and the contracts, as well as evidence regarding industry standards, contain all the evidence needed to verify its reported taxable value for its gas production, then MTG has presented sufficient evidence to support its fuel use deductions. If, however, the Board is correct in its assertion that the fuel use adjustment must be verified by volumetric information of the exact amount of MTG's gas used for fuel, MTG arguably has not presented sufficient evidence and the fuel use deduction was properly disallowed.

[¶ 18] In support of its evidentiary argument, MTG argues that the Department has no statutory authority to look beyond the actual payment received and accepted by MTG as full payment. This Court agrees that an administrative agency, as a creature of statute, must limit its activities to those authorized by the legislature:

It is axiomatic that an agency has and may properly exercise only those powers authorized by the legislature. *U S West Communications, Inc. v. Wyoming Public Service Com'n,* 958 P.2d 371, 374 (Wyo. 1998) (*quoting Tri County Telephone Ass'n, Inc. v. Wyoming Public Service Com'n,* 910 P.2d 1359, 1361 (Wyo.1996)); *Preferred Energy Properties v. Wyoming State Bd. of Equalization,* 890 P.2d 1110, 1113 (Wyo.1995); *Hupp v. Employment Sec. Com'n of Wyoming,* 715 P.2d 223, 225 (Wyo.1986). An agency is wholly without power to modify, dilute or change in any way the statutory provisions from which it derives its authority. When an administrative agency takes an action that exceeds its authority or proceeds in a manner unauthorized by law, that action is null and void. *Triska v. Department of Health and Environmental Control,* 292 S.C. 190, 355 S.E.2d 531, 533 (1987).

*Platte Dev. Co. v. State of Wyoming, Envtl. Quality Council,* 966 P.2d 972, 975 (Wyo. 1998).

[¶ 19] Turning then to the applicable statutes, we find that the Department is charged with arranging for audits of taxpayer-reported values for the purpose of establishing if:

(A) Taxable volumes or values were not accurately reported;

(B) Clerical errors were made in determining taxable volumes or values;

(C) Taxable volumes or values for the year that production occurred were not calculated in compliance with Wyoming statutes or rules governing the determinations; or

(D) Additional payment for production was received and not reported whether such

payment was received in the year of production or in subsequent years.

Wyo. Stat. Ann. § 39–14–208(b)(i) (LexisNexis 2005). Subsection C clearly authorizes the Department to go beyond simply the numbers reported and payments received for production to independently determine if the taxable value was calculated in compliance with applicable Wyoming statutes and rules. Hence, MTG's argument as to the scope of an audit is not well taken.

[¶ 20] As for the actual determination of taxable value, both parties agree that the fair market value of MTG's gas production must be calculated according to Wyo. Stat. Ann. § 39–14–203 (LexisNexis 2005):

(a) Taxable event. The following shall apply:

(i) There is levied a severance tax on the value of the gross product extracted for the privilege of severing or extracting crude oil, lease condensate or natural gas in the state. The tax imposed by this subsection shall be in addition to all other taxes imposed by law including, but not limited to, ad valorem taxes imposed by W.S. 39–13–101 through 39–13–111.

(b) Basis of tax. The following shall apply:

(i) Crude oil, lease condensate and natural gas shall be valued for taxation as provided in this subsection;

\* \* \* \*

(v) If the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection are sold to a third party, or processed or transported by a third party at or prior to the point of valuation provided in paragraphs (iii) and (iv) of this subsection, the fair market value shall be the value established by bona fide arms-length [sic] transaction[.]

The parties to the instant appeal agree that the terms of the sale of MTG's gas to Purchaser resulted from a bona fide arm's-length transaction. The gas purchase contracts embody the terms of that arm's-length transaction. The parties disagree as to the role the gas purchase contracts should play in determining the taxable value of MTG's gas production.

[¶ 21] MTG argues that the Department, pursuant to the valuation statute, has authority to determine only if a contract exists that is the product of a bona fide arms-length transaction. MTG continues that, if such a contract exists, the Department cannot refer to the specific terms of the contract, but rather must accept what the parties agree is an acceptable price under the contract as the fair market value of the purchased gas. Specifically, MTG argues that individual adjustments need not be verified as long as the adjustment itself is allowed by contract. The logic behind this reasoning is that, since the parties to the gas purchase contract have adverse economic interests, neither party will be willing to accept an unreasonable sales price. The price actually paid and received will be a fair reflection of actual market conditions.

[¶ 22] The Department, on the other hand, argues that such an informal approach to valuation will make it impossible to fulfill its statutory duties regarding verifying the self-reported fair market value of production. Specifically, the Department relies upon the language of the statute that "the fair market value **shall be** the value established by bona fide arms-length [sic] transaction" (emphasis added). The Department argues that, in this case, the value established by the bona fide arm's-length transaction is embodied in the terms of the gas purchase contracts. Therefore, the Department concludes, MTG's self-reported value of its gas production can only be verified upon audit by comparing the value reported to the value established by specific pricing terms of the gas purchase contracts.

[¶ 23] Statutory construction is a matter of law which this Court reviews de novo. *Amoco Prod. Co. v. State of Wyoming, Dep' t of Revenue*, 2004 WY 89, ¶ 34, 94 P.3d 430, ¶ 34 (Wyo.2004). While MTG's logic is appealing, the Department presents the more persuasive argument. The language of the statute is plain as it pertains to the instant issue. The fair market value "shall be the value established by bona fide arms-length [sic] transaction." The gas purchase

contracts embody the terms of the arm's-length sales transaction between MTG and Purchaser. Thus, the fair market value "shall be the value established" in the gas purchase contracts. It follows that it is the specific terms of the contracts that must be used to establish the legislatively defined fair market value. In verifying the value of gas production, therefore, the Department is required by the statute to refer to the specific terms of the contracts.

■■■ [¶ 24] Additionally, this Court has previously determined that it is appropriate for the Department to refer to an applicable contract when independently verifying taxable values. In *Preferred Energy Properties v. Wyoming State Bd. of Equalization*, 890 P.2d 1110 (Wyo.1995), there was a disagreement as to whether appellant held an ownership interest in certain well production. The Department and the Board referred to an applicable farmout agreement to resolve the question. Appellant argued that referring to the farmout agreement was beyond the scope of the Board's authority. The Court's response was to:

> hold that an administrative agency, while prohibited from settling or adjudicating rights under a contract, may use a contract as evidence to support its findings or to refute a party's position. See [Wyo. Stat. Ann. § ] 16–3–107(c) (1994 Cum.Supp.) (agency can require production of any relevant documents). Of course, the agency's interpretation of the contract will be subject to judicial review if a party claims error. See [Wyo. Stat. Ann. § ] 16–3–114 (1990) (providing for judicial review of agency actions).

*Preferred Energy*, at 1113. Thus, we consider it settled that the Department can, and should, refer to any applicable contracts when independently verifying taxable values.

■■■ [¶ 25] As applicable to the instant appeal, the gas purchase contracts between MTG and Purchaser all contain essentially the same pricing terms. The pricing terms agreed to by the parties required the contract price of the gas to be computed using a formula that required volumetric information. In other words, under the terms of the contracts, the exact contract price could only be computed if actual volumes were known. The only reference to the fuel use allowance in the pricing terms is to the effect that the general price calculation formula "provides that fuel used in Purchaser's facilities shall be borne by Producer." No formula for calculating the fuel use allowance is provided in the contracts. Because of the contracts' requirement of volumetric information for the general pricing formula, however, it is appropriate to conclude that the contracts anticipated that actual volumes of gas used for fuel would be reported, or at least be verifiable. To this end, the contracts give MTG the right to audit Purchaser's books.

[¶ 26] The monthly gas purchase statements contained the volumes of gas delivered to Purchaser. There is no dispute that MTG's total gas sales volumes were accurately reflected in the invoices. However the invoices, as prepared by Purchaser, did not contain volumetric information regarding the gas used for fuel. The lack of a reference in the invoices to the exact quantity of gas used for fuel is not consistent with the specific pricing term of the sales contracts. Without knowing the exact quantity of gas used for fuel, there was no way of determining if the payment received accurately correlated to the payment that would be due if the sales price was computed according to the pricing terms of the gas purchase contracts.

■■■ [¶ 27] As explained above, the legislature has determined that the fair market value of gas production is controlled by the contract price. The gas purchase contracts in this instance, as agreed to by the parties, required specific volumetric information for the computation of the contract price. Therefore, in order to comply with the statute, the Department was correct in requiring verification of the quantity of gas used as fuel so the figure could be input into the contract pricing formula.

■■■ [¶ 28] There can be no doubt that MTG did not provide the Department with exact volume information concerning the actual amount of gas used for fuel during the audit. MTG admitted, as part of the hearing procedures, that it never audited Purchaser's books or otherwise independently verified

the fuel use deduction taken by Purchaser. As stated in the above facts, when asked for information about how the fuel use adjustment was calculated, MTG responded that it did not know how the fuel adjustment was calculated and instead referred the Department to Purchaser.[1]

[¶ 29] The only MTG employee to testify at the hearing before the Board was Vicki Scheider, an MTG employee for almost twelve years at the time of the hearing, and the employee who did the general accounting for MTG. Ms. Scheider did not, however, do the initial computation of taxable value on the gas production at issue, nor was she personally involved in the audit process. After the audit was completed she used a calculation on the invoices to determine the alleged amount of fuel used by Purchaser for compression activities. Regarding the fuel use adjustment claimed by Purchaser, she testified in part as follows:

[Mr. Hardsocg (for the Department)]: Ms. Scheider, you stated that you were able to use the gas purchase statements to run through this calculation. Can you please explain to me how you got to the 31,169 [a figure derived after the fuel use allowance was taken by Purchaser], which is listed on your calculation and which is also listed on that first gas purchase statement?

[Ms. Scheider]: How I calculated it?

Q: Yes. How did you—

A: I didn't calculate it. I took it off the Western Gas statement.

Q: Okay. But how did Western Gas get to the number 31,169?

A: I haven't checked any of their numbers. I couldn't say how they calculated that.

Q: Is it fair to state that they made a fuel [use] adjustment to get to that number?

A: Yes.

Q: Do you have any idea how they made a fuel [use] adjustment?

A: I don't have those calculations in front of me.

Q: So what you're saying is by—you simply accepted as true the $31,169.10 as the value reported on the Western Gas purchase statement?

A: Yes.

Q: Isn't it true, then, that the fuel [use] adjustment is not specifically broken out on the Western Gas statement?

A: It is not.

[¶ 30] MTG also evoked testimony at the hearing from a representative from Purchaser explaining the back calculation. The testimony from the representative of Purchaser is summarized by the following excerpt:

[Board member]: [I]f I were to look at this [gas purchase] statement, how would I know that the fuel factor was the correct fuel factor?

[Purchaser representative]: You would have to run through exactly the calculation.

Q: But how would I know that? I mean, I can get the arithmetic portion, but how do I know that that's the correct portion I'm being billed for?

A: You do not. All you know is that is what you were billed for. If you run through this calculation, you know that's what you were billed for. If it's correct or not is somewhat a matter of being explained what the typical fuel rates would be.

Q: Nevertheless, there is a leap of faith that goes on here on the part of the producer, then, correct?

A: I would call it a very small leap of faith. We feel an obligation as a provider of services or as a purchaser to at least demonstrate these are valid or reasonable numbers. If they want to go further than that and take the time to audit the books, we're perfectly open to that, too, but most producers become fairly knowledgeable that it takes X amount of fuel and doesn't matter whether you're selling to Western or MIGC or Bear Paw or Enron or who it is, but that it takes X amount of fuel to provide that service. As long as they back calculate this number and that is reason-

1. The Department never contacted Purchaser, nor was it required to. As explained in ¶ 14, the onus is on MTG to provide all necessary documentation.

able or lower than normal, they are quite satisfied, and I think rightfully so.

The Purchaser representative also testified that the gas purchase contracts only provided for a fuel use deduction to be factored into the pricing. The pricing terms did not precisely dictate how the fuel use adjustment was to be calculated. The Purchaser representative did not present any evidence verifying the exact volume of gas used for fuel.

[¶ 31] Purchaser was the entity that calculated the fuel use deduction and the entity that MTG referred the auditor and the Department to for information regarding the fuel use adjustment. As such, it can be assumed that the Purchaser representative would be the person with the most knowledge as to the calculation of the fuel use allowance. As the representative from Purchaser testified, the exact volume of fuel used could not be precisely determined solely from the contracts and the invoices. The producer would have to audit Purchaser's books for further information. No other evidence contradicted this testimony.

[¶ 32] Based upon the evidence received at the hearing, the Board specifically found that MTG failed to present volumetric information verifying the exact amount of fuel used for compression activities. After a full review of the record, this Court determines that this finding is supported by substantial evidence. The evidence shows that MTG contractually had the option of auditing Purchaser's books but chose not to do so. MTG simply accepted the payment price as calculated by Purchaser without verification of the actual volumes of gas used for fuel. No further evidence regarding the actual volume of fuel used for compression activities was presented at the hearing.[2] This Court also agrees that the lack of volumetric information made it impossible for the Department to verify that MTG received the contract

price for its gas production. MTG's fuel use deduction was necessarily disallowed for lack of verification that the monetary amount of the deduction complied with the terms of the gas purchase contracts.

[¶ 33] We therefore disagree with the order of the district court and hold that the evidence presented by MTG at the Board hearing was not sufficient under the law to support its claimed fuel use deduction. The district court's decision reflects the wrong standard of review. Whether or not MTG presented sufficient evidence supporting its position is not relevant to the review of agency action after a full hearing. The standard of review requires the reviewing court to determine if; upon review of the entire record, substantial evidence exists to support the agency action. Upon reading the Board's order after hearing and the Board's order denying MTG's motion to dismiss, it is apparent that the Board did not ignore the evidence presented by MTG. The Board simply decided that the evidence presented by MTG was not sufficient to verify the volume of gas used for fuel. The Board concluded that without such volume verification, MTG could not prove that its reported taxable value was indeed the fair market price of that production. The decision of the Board is supported by substantial evidence and is otherwise in accord with applicable law.

[¶ 34] Finally, MTG argued before the Board, as it argues here, that any outcome requiring MTG to pay further taxes represents an unlawful impairment of its contracts with its royalty holders, working interest owners and net profits interest owners. MTG's argument is not founded on law, but rather on the particular circumstances in which it finds itself. MTG shut in the producing wells in question a few years ago and thus has no revenue from that field with

---

2. MTG asserts that, for various reasons, neither itself nor Purchaser could obtain the actual volume figures. Even assuming this assertion is correct, it has no relevance to this appeal. MTG agreed to the terms of the contracts. The parties could have agreed to any of several different methods for valuing gas used for fuel. The fact that the contracts ultimately entered into by the parties call for information not readily available

to either MTG or Purchaser simply reflects a mistake on their part. MTG may be willing to accept valuations without verification, but the Department is statutorily prohibited from doing the same. Referring to the terms of the contract for the method of verifying information concerning the contract price is not "reinterpreting" the contract.

which to pay any additional tax liability. The only method of collecting additional funds for payment of the increased tax liability is to bill the interest holders for their respective share of the liability. MTG argues that this billing, to collect for the payment of taxes on an amount of revenue never received, imposes a liability on the interest holders never anticipated in their contracts and therefore wrongfully impairs the contracts MTG has with its various interest holders.

[¶ 35] While we recognize the inherent difficulty involved in imposing further tax liabilities on a producer that has shut in its wells, the potential for such a result is clearly recognized by Wyoming statutes. A producer must be aware of the potential for an audit of its reported production value to be commenced "within six (6) months immediately following the three (3) years following the reporting period." § 39–14–208(b)(vii) (amended 2005). The producer may choose to pass any further potential liability for additional taxes on to its interest holders through its contracts with them, in which case the interest holders are aware of the possibility of an audit as well. There are three possible results from an audit: taxpayer's tax liability stays the same; the tax liability is reduced, or the tax liability is increased. Any of these results must be anticipated by the parties to the contracts.

[¶ 36] An audit, as provided for by Wyoming statute, does not change the terms of the contracts nor does it impose liabilities upon the parties beyond those expected under the contract. There is no impairment, unlawful or otherwise, of the contracts between MTG and its various interest holders since all parties at least should have anticipated the possibility of further tax liability upon audit. Neither MTG nor any of its interest holders can blame the Department for any increased tax liability caused by the reporting practices chosen by MTG that resulted in a self-reported taxable value that MTG could not adequately verify upon request by the Department.

## CONCLUSION

 [¶ 37] The legislature has determined that the fair market value of natural

gas production applicable to the instant sale is the value established by a bona fide arm's-length transaction. When the terms of such a transaction are memorialized in writing, it is the written terms that determine the fair market value of the natural gas production.

[¶ 38] MTG sold its gas to Purchaser pursuant to a bona fide arm's-length transaction. The transaction was memorialized in written gas purchase contracts. The contracts all provided that the sales price of MTG's gas was to be determined pursuant to a formula based on volumetric information. MTG did not document the exact volume of gas used for fuel. Because the exact volume of gas used for fuel was not documented, the contract price for that gas, its legislatively defined fair market value, could not be precisely established.

[¶ 39] The decision of the Department disallowing MTG's deduction based upon the fuel use adjustment is affirmed. The order of the district court is reversed and this case is remanded to the district court with directions to affirm the Board's order.