2008 WY 155

## WILLIAMS PRODUCTION RMT COMPANY, Appellant (Petitioner),

v.

## WYOMING DEPARTMENT OF REVENUE, Appellee (Respondent).

No. S–08–0018.

Supreme Court of Wyoming.

Dec. 31, 2008.

---

Representing Appellant: Patrick R. Day and Delissa L. Hayano of Holland & Hart LLP, Cheyenne, Wyoming. Argument by Mr. Day.

Representing Appellee: Bruce A. Salzburg, Attorney General; Michael L. Hubbard, Deputy Attorney General; Martin L. Hardsocg, Senior Assistant Attorney General; Karl D. Anderson, Senior Assistant Attorney General. Argument by Mr. Hardsocg.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶1] After the Wyoming State Board of Equalization (Board) affirmed the Depart-

ment of Revenue's (DOR) valuations of Williams Production RMT Company's (Williams) coal bed methane (CBM) production for production years 2000–2002, Williams sought review in district court. The DOR moved for, the district court ordered and this Court accepted certification pursuant to W.R.A.P. 12.09(b). The principal issue for our determination is whether, as the Board ruled, the point of valuation of Williams' 2000–2002 CBM production was at the outlet of the initial dehydrator pursuant to Wyo. Stat. Ann. § 39–14–203(b)(iv) (LexisNexis 2007), or, as Williams maintains, was upstream from the initial dehydrator where Williams transferred the CBM by bona fide arms-length transaction to a third party for transportation. For the reasons set forth in *Kennedy Oil v. Wyo. Dep't of Revenue,* 2008 WY 154, —— P.3d —— (Wyo.2008), we affirm the Board's ruling as to the point of valuation. On the two secondary issues, we affirm the Board's ruling on the deduction allowed for downstream transportation costs and reverse the Board's decision denying Williams an on-lease fuel exemption.

## ISSUES

[¶ 2] The following issues are determinative of this appeal:

1. Whether the Board correctly determined that the point of valuation of CBM for severance and ad valorem tax purposes is at the outlet of the initial dehydrator rather than upstream where Williams sold or transferred it to a third party.

2. Whether the Board's ruling on the deduction allowed for transportation costs downstream of the outlet of the initial dehydrator was supported by substantial evidence.

3. Whether the Board's ruling denying Williams a fuel use exemption was supported by substantial evidence.

## FACTS

[¶ 3] In 2000, 2001 and 2002, Williams produced CBM from the Powder River Basin in northeastern Wyoming. Williams entered into a contract with Western Gas (Western)

pursuant to which Williams transferred the CBM to Western at Western's screw compressor facility for transportation downstream to additional compressors, the dehydrator and the inlets of the Fort Union or MIGC pipeline.

[¶ 4] For production years 2000–2002, Williams considered the point of valuation to be the place of transfer and calculated and paid production taxes by deducting from the CBM sales price the fees charged by Western.[1] In 2006, the Wyoming Department of Audit (DOA) completed an audit of Williams' 2000–2002 CBM production from the Powder River Basin. The DOA re-evaluated Williams' production and disallowed the deduction of Western's fees. The DOA issued a final decision letter to Williams in August of 2006 finding that Williams owed an additional $2,030,406.01 in severance taxes for the 2000–2002 production years. The DOR adopted the DOA's findings and issued a letter notifying Williams that it owed the additional amount.

[¶ 5] Williams appealed the decision to the Board, which held a three-day contested case hearing in March of 2007. At the hearing, Williams asserted that § 39–14–203(b)(v) controlled the valuation of CBM transported by a third party prior to the outlet of the initial dehydrator and that paragraph (b)(v) worked with paragraph (b)(vi)(B) to allow the deduction of all third party charges, including those upstream from the outlet of the initial dehydrator. The DOR contended that the outlet of the initial dehydrator was the point of valuation of CBM and third party charges upstream from the point of valuation were not deductible in determining fair market value.

[¶ 6] In the course of the hearing, the parties agreed that portions of the audit required recalculation, including the disallowance of an exemption for fuel Western consumed in the production process upstream from the outlet of the initial dehydrator. At the close of the hearing, the Board directed the parties to provide recalculated figures to each other and then submit briefs addressing

---

1. Although it is not clear from the record, we assume the sales price was determined by the comparable value method as provided in § 39–14–203(b)(vi)(B).

the recalculation. Upon considering the parties' supplemental briefs, the Board affirmed the DOR's valuation, concluding that § 39–14–203(b)(iv) requires taxable value to include third party fees incurred prior to the outlet to the initial dehydrator. Addressing the collateral issue of Williams' entitlement to a fuel use exemption, the Board concluded that Williams failed to carry its burdens of proof and persuasion because it provided no evidence to support its claim. Williams filed a petition for review of the Board's decision in the district court, which certified the matter to this Court.

## STANDARD OF REVIEW

[¶ 7] Our review of administrative agency action is governed by Wyo. Stat. Ann. § 16–3–114 (LexisNexis 2007), which provides in pertinent part:

(c) To the extent necessary to make a decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action. In making the following determinations, the court shall review the whole record or those parts of it cited by a party and due account shall be taken of the rule of prejudicial error. The reviewing court shall:

(i) Compel agency action unlawfully withheld or unreasonably delayed; and

(ii) Hold unlawful and set aside agency action, findings and conclusions found to be:

(A) Arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law;

(B) Contrary to constitutional right, power, privilege or immunity;

(C) In excess of statutory jurisdiction, authority or limitations or lacking statutory right;

(D) Without observance of procedure required by law; or

(E) Unsupported by substantial evidence in a case reviewed on the record of an agency hearing provided by statute.

[¶ 8] When reviewing a case certified to us from a district court pursuant to W.R.A.P. 12.09(b), we apply the appellate standards applicable to a reviewing court of the first instance. *Williams Prod. RMT Co. v. State Dep't of Revenue,* 2005 WY 28, ¶ 7, 107 P.3d 179, 182–183 (Wyo.2005) (*Williams I*). We review factual determinations for substantial evidence, meaning we consider whether there is relevant evidence in the entire record which a reasonable mind might accept in support of the agency's conclusions. *Dale v. S & S Builders, LLC,* 2008 WY 84, ¶ 21, 188 P.3d 554, 561 (Wyo.2008). Importantly, our review of any particular decision turns not on whether we agree with the outcome, but on whether the agency could reasonably conclude as it did based upon all of the evidence presented. *Id.,* ¶ 23, 188 P.3d at 561. The burden of proof with respect to tax valuation is on the party asserting an improper valuation. *Williams I,* ¶ 7, 107 P.3d at 183. We review an agency's conclusions of law *de novo,* and will affirm an agency's legal conclusion only if it is in accordance with the law. *Dale,* ¶ 27, 188 P.3d at 562. Statutory interpretation is a question of law and is reviewed *de novo. Williams I,* ¶ 8, 107 P.3d at 183.

## DISCUSSION

### 1. Point of Valuation

[¶ 9] Section 39–14–203 provided in relevant part as follows:

§ 39–14–203. Imposition

(a) Taxable event. The following shall apply:

(i) There is levied a severance tax on the value of the gross product extracted for the privilege of severing or extracting crude oil, lease condensate or natural gas in the state. The tax imposed by this subsection shall be in addition to all other taxes imposed by law including, but not limited to, ad valorem taxes imposed by W.S. 39–13–101 through 39–13–111.

(b) Basis of tax. The following shall apply:

(i) Crude oil, lease condensate and natural gas shall be valued for taxation as provided in this subsection;

(ii) The fair market value for crude oil, lease condensate and natural gas shall be determined after the production process is completed. Notwithstanding paragraph (x) of this subsection, expenses incurred by the producer prior to the point of valuation are not deductible in determining the fair market value of the mineral;

(iii) The production process for crude oil or lease condensate is completed after extracting from the well, gathering, heating and treating, separating, injecting for enhanced recovery, and any other activity which occurs before the outlet of the initial storage facility or lease automatic custody transfer (LACT) unit;

(iv) The production process for natural gas is completed after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator. When no dehydration is performed, other than within a processing facility, the production process is completed at the inlet to the initial transportation related compressor, custody transfer meter or processing facility, whichever occurs first;

(v) If the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection are sold to a third party, or processed or transported by a third party at or prior to the point of valuation provided in paragraphs (iii) and (iv) of this subsection, the fair market value shall be the value established by bona fide arms-length transaction;

(vi) In the event the crude oil, lease condensate or natural gas production as provided by paragraphs (iii) and (iv) of this subsection is not sold at or prior to the point of valuation by bona fide arms-length sale, or, except as otherwise provided, if the production is used without sale, the department shall identify the method it intends to apply under this paragraph to determine the fair market value and notify the taxpayer of that method on or before September 1 of the year preceding the

year for which the method shall be employed. The department shall determine the fair market value by application of one (1) of the following methods:

(A) Comparable sales—The fair market value is the representative armslength market price for minerals of like quality and quantity used or sold at the point of valuation provided in paragraphs (iii) and (iv) of this subsection taking into consideration the location, terms and conditions under which the minerals are being used or sold;

(B) Comparable value—The fair market value is the arms-length sales price less processing and transportation fees charged to other parties for minerals of like quantity, taking into consideration the quality, terms and conditions under which the minerals are being processed or transported;

(C) Netback—The fair market value is the sales price minus expenses incurred by the producer for transporting produced minerals to the point of sale and third party processing fees. The netback method shall not be utilized in determining the taxable value of natural gas which is processed by the producer of the natural gas;

(D) Proportionate profits—The fair market value is:

(I) The total amount received from the sale of the minerals minus exempt royalties, nonexempt royalties and production taxes times the quotient of the direct cost of producing the minerals divided by the direct cost of producing, processing and transporting the minerals; plus

(II) Nonexempt royalties and production taxes.

■ [¶ 10] Williams asserts the Board's ruling that the point of valuation is at the outlet of the initial dehydrator pursuant to § 39–14–203(b)(iv) is contrary to the plain meaning of the statute. Williams contends that because it transferred the CBM to Western upstream from the outlet of the initial dehydrator, § 39–14–203(b)(v) controls and the fair market value of the CBM for tax purposes was to be established by consider-

ing the fees charged by a third party in an upstream arms-length transaction. Williams maintains the following formula applied: arms-length sales price minus fees paid to a third party in an arms-length transaction prior to the initial dehydrator equals fair market value at the end of production.

[¶ 11]  The DOR responds that the Board correctly found the point of valuation of Williams' CBM production was at the outlet of the initial dehydrator. The DOR asserts that this result is in accordance with the plain meaning of § 39–14–203(b)(ii) and (iv). The DOR maintains that a sale to or transportation by a third party upstream from the outlet of the initial dehydrator does not change the point of valuation, which § 39–14–203(b)(ii) and (iv) clearly define as "after the production process is completed," that is, "after extracting from the well, gathering, separating, injecting and any other activity which occurs before the outlet of the initial dehydrator." Pursuant to § 39–14–203(b)(ii), the DOR contends Williams was not entitled to deduct expenses incurred prior to the outlet of the initial dehydrator in determining the fair market value of its CBM production, including Western's fees for transporting the product.

[¶ 12]  Our review of statutory provisions is governed by the following standards:

The paramount consideration is to determine the legislature's intent, which must be ascertained initially and primarily from the words used in the statute. We look first to the plain and ordinary meaning of the words to determine if the statute is ambiguous. A statute is clear and unambiguous if its wording is such that reasonable persons are able to agree on its meaning with consistency and predictability. Conversely, a statute is ambiguous if it is found to be vague or uncertain and subject to varying interpretations. If we determine that a statute is clear and unambiguous, we give effect to the plain language of the statute.

*RME Petroleum Co. v. Wyo. Dep't of Revenue*, 2007 WY 16, ¶ 25, 150 P.3d 673, 683 (Wyo.2007) (citation omitted).

[¶ 13]  Applying these principles, we addressed the same issue presented here in *Kennedy Oil* as follows:

Section 39–14–203(b)(ii) clearly and unambiguously provides that the fair market value for gas is determined after the production process is complete. Paragraph (b)(iv) further provides that the production process for gas is completed after it is extracted from the well, gathered, separated, injected and any other activity which occurs before the outlet of the initial dehydrator. Under the clear language of paragraph (b)(ii), producer expenses incurred prior to the point of valuation, i.e. the outlet of the initial dehydrator, are not deductible. The DOR properly determined the fair market value of Kennedy's CBM production after the production process was complete and disallowed expenses Kennedy incurred before the outlet of the initial dehydrator.

*Kennedy Oil*, ¶ 28, ___ P.3d at ___.

[¶ 14]  For the reasons explained fully in *Kennedy*, we hold that the DOR properly determined that the fair market value for Williams' CBM included the third-party transportation fees incurred before the outlet of the initial dehydrator. The fair market value of the production was the value established by bona fide arms-length transaction— the arms-length sales price plus the fee Williams paid to Western for getting the gas to the initial dehydrator minus the transportation fees incurred downstream of the point of valuation. Rather than the formula Williams advances (arms-length sale price minus all of the arms-length transportation fees, including those incurred prior to the point of valuation, equals fair market value at the end of production), the DOR properly determined the taxable value of the gross CBM production based upon the value established by the sales price and the bona fide arms-length transaction in which Williams paid Western a fee to transport the gas to the initial dehydrator. That fee was due to activities that occurred before the outlet of the initial dehydrator, which means the production process was not complete when the fee was incurred. The point of valuation remained the point at which the production

process was complete and the expenses Williams incurred prior to that point were not deductible in determining the fair market value.

[¶ 15] In arguing otherwise, Williams begins with the assertion that transportation and processing activities are not taxable. Williams cites *RME*, ¶ 51, 150 P.3d at 691, where, in describing the taxpayers' argument in that case, we said:

> Taxpayers contend, somewhat persuasively, that the Department's approach undermines the allocation function of the direct cost ratio because as prices for oil and gas rise, royalties and production taxes also increase. As a result, the direct cost ratio approaches 100% when prices are high, negating the purpose of allocating a portion of a taxpayer's revenue to *non-taxable functions, i.e. processing and transporting.*

[¶ 16] The question for this Court's determination in *RME* was whether the Board properly determined that § 39–14–203(b)(vi)(D), which describes the proportionate profits method for determining fair market value when minerals are sold downstream from the dehydrator, required royalties and production taxes to be treated as direct costs of production. We held the Board's determination was incorrect and that royalties and production taxes were not "direct costs of producing" within the direct cost ratio of the oil and gas proportionate profits formula. After finding § 39–14–203(b)(vi)(D) ambiguous because it did not specify that royalties and production taxes were either to be included or excluded as direct costs of producing, we looked to the Rules promulgated by the DOR after § 39–14–203(b)(vi)(D) was enacted defining "direct costs of producing." Because the Rules did not include royalties and production taxes within the definition, we held royalties and production costs were not "direct costs of producing."

[¶ 17] Our decision in RME is of limited significance to the issue before us in this case. *RME* involved the question of how royalties and production taxes were considered in the proportionate profits method for determining the fair market value of miner-

als sold downstream of the point of valuation, an entirely different scenario than when minerals are sold to or transported by a third party upstream of the point of valuation. Although it is not evident from the discussion in that case, we presume the costs of production utilized in the proportionate profit formula included all costs up to the outlet of the initial dehydrator. In the valuation methods prescribed by statute for both sales upstream and sales downstream of the point of valuation, § 39–14–203(b)(ii) clearly provides that any expenses incurred by the producer prior to the point of valuation are included in the calculation of fair market value. Williams incurred the expenses prior to the point of valuation; therefore, they were not deductible in determining the fair market value of the CBM for tax purposes.

[¶ 18] Williams contends that paragraph (b)(vi) supports its reading of the statute. That section provides that when CBM is not sold at or before the point of valuation by bona fide arms-length sale, or if it is used without sale, the fair market value is determined by application of one of four methods: comparable sales, comparable value, netback or proportionate profits. As support for its claim that it was entitled to a deduction, Williams points to language in paragraphs (b)(vi)(B) and (C), which allow the deduction of processing and transporting expenses under the comparable value and netback methods for determining fair market value. Williams argues that because § 39–14–203(b)(vi) allows the deduction of all processing and transporting costs when a sale occurs after the outlet of the initial dehydrator, the legislature must have intended those deductions to be allowed for all of those costs when a sale to or transportation by a third party occurs before the outlet of the initial dehydrator. Williams' argument misses the point that, under the approach taken by the legislature, it is not the characterization of the costs as processing or transportation that makes them deductible, but where the activities occur in the chain of events from the wellhead to the interstate transmission pipeline. Again, we conclude that if the legislature had intended to allow deductions for transportation expenses incurred prior to the

point of valuation, it would have said so. Instead the legislature clearly established the end of the production process as the point of valuation and declared that expenses incurred prior to that point, however they may be delineated, are not deductible from the fair market value of the gas.[2]

[¶ 19]   Williams also argues that under established oil and gas law, production occurs when the minerals are severed from the earth; minerals cannot be sold until they are produced; therefore, the sale of minerals to a third party signals the end of the production process. Williams' argument in this regard ignores the plain language of § 39–14–203(b)(iv), which expressly defines the end of the production process for mineral tax purposes. Nowhere in that definition is the sale of minerals to a third party identified as an event that completes the production process. Williams also asserts that the language contained in § 39–14–203(b)(iv) defining when the production process for natural gas is completed was intended to determine taxable value only when the producer does its own transporting and processing with its own equipment, not when a third party carries out those activities. We see nothing in the provision to support that conclusion. If the legislature had intended paragraph (b)(iv) to apply only to activities performed by the producer itself before the outlet of the initial dehydrator, it easily could have said so. We will not insert the word "producer" into the existing statutory language. Williams suggests that use of the different terms in subsection (vi) "*expenses* incurred by the producer" and "*fees* charged to third parties," and the language in subsection (ii) providing that only "expenses incurred by the producer" are not deductible indicates the legislature meant to differentiate between producer expenses and third party fees and allow deduction of third party fees upstream of the point of valuation. We find the terminology in subsection (vi) insufficient to support a conclusion that directly contradicts the many clear statements in the statute that the outlet

of the initial dehydrator is the legislatively drawn point of valuation.

[¶ 20]   It is true that the statute, as interpreted by the DOR, results in some aspects of gas transportation being included on the production side of the ledger. The line for taxation purposes between mineral production and transportation or processing has been the subject of dispute for many years. *Hillard v. Big Horn Coal Co.,* 549 P.2d 293 (Wyo.1976); *Appeal of Monolith Portland Midwest Co., Inc.,* 574 P.2d 757 (Wyo.1978). While gas gathering necessarily involves some element of transportation, it is, by statute, defined as part of the production process. Section 39–14–203(b)(iii). Drawing the line between gathering and transportation has been the source of considerable debate in the royalty context and the legislature ended that debate by statute. *Wold v. Hunt Oil Co.,* 52 F.Supp.2d 1330 (D.Wyo.1999). *See Cabot Oil & Gas Corp. v. Followill,* 2004 WY 80, 93 P.3d 238 (Wyo.2004) (discussing the fact that gathering involves transportation and costs associated with transportation during the gathering process are non-deductible). It is clear to us that the legislature was determined to end that dispute in the tax arena also by drawing a clear line at the outlet of the initial dehydrator where production would be considered complete. Williams makes a persuasive argument that the free market should control the valuation of gas; a bona fide arms-length transaction assures the true fair market value; and the legislature's prime concern was assuring that a fair value was reached when the producer transported and processed its own gas, and consequently, the legislature must have intended arms-length transactions before the initial dehydrator would determine fair market value. However, to reach that conclusion we are asked to assume too much, read language in and out of the statute, and ignore the plain language chosen by the legislature. We simply cannot go that far. We are confident that if we are wrong, and Williams is correct

---

**2.**   It is interesting to note that Williams' appellate brief recognizes that the proportionate profit and netback valuation methods only allow deduction of transportation and processing costs incurred after the initial dehydrator which is completely consistent with subsection (v) and the legislative scheme that establishes that point as the point of valuation whether the sale is upstream or downstream.

in its divination of legislative intent, the legislature will act.

[¶21] Citing *Wyo. Dep't of Revenue v. Guthrie,* 2005 WY 79, ¶23, 115 P.3d 1086, 1095 (Wyo.2005), Williams asserts that its contract with Western rather than the location of the dehydrator established the fair market value of its production for tax purposes. In *Guthrie,* a CBM producer sold its production pursuant to a bona fide arm's-length transaction the terms of which were reflected in gas purchase contracts. The purchaser paid the producer for the gas received less the amount of gas it used as fuel for compression activities. The producer accepted the purchaser's invoice pricing and reported and paid taxes on the revenue received from the purchaser.

[¶22] During an audit, the auditor requested information from the producer to verify the fuel use adjustment. When the producer failed to provide verification, the auditor disallowed the deduction. The Board affirmed the decision disallowing the deduction because the producer failed to produce evidence of the actual amount of gas used as fuel. *Id.,* ¶7, 115 P.3d at 1090. On appeal, the district court reversed, holding that the producer's acceptance of the purchaser's invoice pricing was sufficient evidence to support the deduction and, if more verification was needed, data showing typical industry fuel usage in the region was sufficient. *Id.,* ¶38, 115 P.3d at 1093.

[¶23] The DOR appealed to this Court and the focus of our inquiry was "what, exactly, [the producer] was required to prove" to support its fuel use deductions and reported taxable value for its gas production. *Id.,* ¶17, 115 P.3d at 1093. We concluded the DOR properly disallowed the deduction. We said, "Because the exact volume of gas used for fuel was not documented, the contract price for that gas, its legislatively defined fair market value, could not be precisely established." *Id.,* ¶38, 115 P.3d at 1098.

[¶24] In the context of the inquiry in *Guthrie,* we said the specific terms of the gas purchase contracts must be used to establish the legislatively defined fair market value. We did not say, as Williams seems to contend, that the purchase contracts changed the point of valuation or allowed the producer to deduct expenses incurred prior to the point of valuation. Our holding in *Guthrie* was limited to the determination that the DOR properly disallowed fuel deductions for which there was insufficient verification. The fact that the DOR may not have addressed the expenses the producer incurred upstream of the initial dehydrator in *Guthrie* does not undermine its application of the statute in this case and in *Kennedy.*

[¶25] In *Williams I,* this Court affirmed a Board ruling that the point of valuation was at the outlet of the TEG dehydrator, a specialized dehydrator, rather than upstream at one of the points where incidental water separation occurs. We agreed that the Board's interpretation of § 39–14–203(b)(iv) as placing the point of valuation at a piece of equipment (the outlet of the TEG dehydrator) rather than at the point where a particular function takes place (the initial point of any dehydration) was consistent with legislative intent. In accordance with *Williams,* we hold that the point of valuation for William's CBM production was the outlet of the initial dehydrator (a particular piece of equipment) and not some point upstream where the product was sold to or transported by a third party (a particular function). We further hold that, in determining the fair market value of its production for tax purposes, Williams was not entitled to deduct expenses incurred prior to the point of valuation.

## 2. Disallowance of Downstream Transportation Fee Deduction and On–Lease Fuel Exemption

[¶26] Williams also contends the Board erred when it disallowed a deduction for transportation expenses incurred downstream of the outlet of the initial dehydrator and refused to recognize an on-lease fuel exemption under Wyo. Stat. Ann. § 39–14–205(j) (LexisNexis 2007). We review these issues to determine whether substantial evidence supported the Board's rulings. We address the two issues Williams raises separately, beginning with the downstream transportation expenses.

[¶ 27] As provided by the gas gathering agreement, Williams paid Western a fee of $29.4/MCF [3] to transport the CBM from the point where it was delivered to Western to the Fort Union or MIGC pipelines. Fort Union, for a fee of $.14/MCF, and MIGC, for a fee of $.35/MMBTU,[4] transported the CBM downstream to interstate transmission pipelines near Glenrock, Wyoming. From there, the gas continued on downstream and was sold.

[¶ 28] Because the dehydrator, i.e., the point of valuation, was located downstream from the point where Western took over transporting the product but upstream from the inlet to the Fort Union and MIGC pipelines, the DOR determined Williams was entitled to deduct part of the transportation fee it paid to Western. The DOR determined that $.21/MCF of the fee was attributable to upstream transportation, making it non-deductible, and the remaining $.8/MCF fee was attributable to downstream transportation and was deductible.

[¶ 29] For gas transported to the MIGC pipeline, Western gave Williams a rebate of $.21/MMBTU.[5] For gas transported to the Fort Union pipeline, Williams received no rebate. In calculating the fair market value of the production transported to the Fort Union pipeline, the DOR disallowed a deduction for the $.21/MCF Williams paid Western to transport the gas upstream to the dehydrator, but allowed a deduction for the $.22/MCF Williams paid to have it transported downstream from the dehydrator, that is, the $.8/MCF fee for transportation from the dehydrator to the pipeline plus the $.14/MCF

Fort Union charged for transporting the gas through its pipeline. For gas transported to the MIGC pipeline, the DOR likewise disallowed a deduction for the $.21/MCF Williams paid to have Western transport the gas to the dehydrator, but allowed a deduction for the $.43/MCF paid to have it transported downstream from the dehydrator, that is, $.8/MCF from the dehydrator to the MIGC inlet plus the $.35/MMBTU MIGC charged for transporting the gas through its pipeline.

[¶ 30] Williams challenges this last calculation as not accounting for the $.21/MMBTU rebate it received from Western for transporting the CBM from the point where it was delivered to Western to the MIGC pipeline. Williams asserts that the net effect of the rebate was that Williams paid Western the difference between the fee amount of $.29/MCF and the rebate amount of $.21/MMBTU, or $.10/MCF. Williams contends the DOR should have allowed the $.10/MCF as a deduction.

[¶ 31] The DOR responds that, with no cooperation from Williams, it calculated a deduction for the part of Western's fee downstream from the dehydrator, something it was not required to do when Williams provided no supporting information. The DOR also points out that this Court previously upheld the same method for calculating allowable deductions in *Williams I*. There, as here, the deduction the DOR allowed was comprised of $.14/MCF for transportation fees from the inlet to the pipeline to Glenrock, plus $.08/MCF of the $.29/MCF fee paid to Western for transporting the CBM from the point where Western received it to

3. MCF, or one thousand cubic feet of natural gas measured at standard pressure and temperature conditions, is a volumetric measurement.

4. MMBTU, or one million British thermal units, is a thermal content measurement.

5. A former Western employee testified at the Board hearing that the reason for the rebate was that it allowed Western the flexibility of moving the gas onto either the MIGC or Fort Union pipeline with the cost to Williams being approximately the same, i.e. going by Fort Union, the fee for Western was $.29.4/MCF plus $.14/MCF for Fort Union, or $.43.4/MCF; going by MIGC, the fee for Western was $29.4/MCF with a rebate of $.21/MMBTU plus $.35/MMBTU for MIGC, or $.43.4. The same witness explained that the fee

provisions for delivery into the MIGC or Fort Union pipelines were based on MCFs because volumes of gas need to be compressed and dehydrated even though BTU content varies across the Powder River Basin. Western based its anticipation of a revenue stream on service costs without regard for heat content. Western's responsibility for redelivery of gas, however, was based on thermally equivalent volumes because the producer ultimately sells on a BTU basis. In its findings of fact, the Board noted the witness's lack of strict attention to measurement by MCF or MMBTU while also noting that a charge of a given number of cents per volume does not directly translate into a charge of a given amount per MMBTU.

the pipeline. *Williams I,* ¶ 25, 107 P.3d at 186–187. There, as here, the $.08/MCF was an estimate of the costs of transporting the CBM from the outlet of the dehydrator to the inlet of the MIGC or Fort Union pipeline. *Id.* In *Williams I,* as here, the DOR disallowed $.21/MCF, the fee paid to Western for transportation upstream from the outlet of the dehydrator, and did not account for the $.21 rebate in the way Williams asserts it should have. As we did in *Williams I,* we conclude that the Board's findings were supported by substantial evidence.

■ [¶ 32] Williams next contends that the Board improperly rejected its request for an on-lease fuel exemption. Williams asserts that it was entitled to the exemption pursuant to Wyo. Stat. Ann. § 39–14–205(j), which provides in pertinent part as follows:

> (j) Natural gas ... which is ... consumed prior to sale for the purpose of maintaining, stimulating, treating, transporting or producing crude oil or natural gas on the same lease or unit from which it was produced has no value and is exempt from taxation.

[¶ 33] The DOR responds that the Board correctly denied the exemption request because Williams did not identify the issue in advance of the hearing and did not develop a sufficient record during the hearing to support its claim. The DOR asserts the lack of timely notice to the DOR and the Board invokes due process concerns. The DOR also contends, even if Williams had properly raised the issue, it failed to carry its burden of proving the amount of the claimed exemption. Rather, the DOR contends, Williams "relied upon broad statements of entitlement and a hope that the Department would graciously re-open the audit after the assessment, appeal and hearing." The DOR contends the Board's ruling that Williams failed to carry its burden of proof and persuasion was supported by substantial evidence.

[¶ 34] From the record before us, we know that Williams' district manager testified that Western's compression equipment was located on the lease, and fueled by gas produced by Williams from the lease. We also know that one of the State's auditors testified that an exemption should have been allowed for fuel used on the lease prior to the point of valuation because such fuel has no value for tax purposes. Additionally, in its post-hearing brief, the DOR stated that it had reviewed additional information Williams supplied and agreed to "revise the audit assessment consistent with [the parties'] cooperative recalculation of taxable value." The DOR calculated the taxable value of the exempt production at approximately $2,998,927 while Williams offered the figure of $2,998,620.

[¶ 35] The record is clear that both parties agreed Williams was entitled to a fuel use exemption; their figures differed by only $307.00. Given the parties' agreement, we hold that the Board could not reasonably conclude that Williams failed to meet its burden of showing that it was entitled to a fuel use exemption. However, Williams failed to present evidence substantiating its assertion that the taxable value of the fuel used was $2,998,620; therefore, we hold that the specific adjustment is to be based upon the DOR's figure of $2,998,927.

## CONCLUSION

[¶ 36] Section 39–14–203(b) clearly provides that CBM is to be valued after completion of the production process which occurs after it is extracted, gathered, separated, injected and any other activity which occurs before the outlet of the initial dehydrator. Pursuant to that provision, the point of valuation of Williams' 2000–2002 CBM production was at the outlet of the initial dehydrator. The statutory language also clearly provides that expenses incurred by the producer prior to the point of valuation are not deductible in determining fair market value. Therefore, the expenses Williams incurred in contracting with Western to transport the CBM upstream from the outlet of the initial dehydrator were not deductible.

[¶ 37] The Board's ruling upholding the DOR's calculations of the allowable deductions was supported by substantial evidence. The Board's ruling disallowing an on-lease fuel exemption was not supported by substantial evidence. Williams was entitled to the exemption based upon the DOR's calcula-

tion of the taxable value of the fuel used on-lease.

[¶ 38]    Affirmed in part, reversed in part, and remanded to the district court for further proceedings consistent with this opinion.